Your Honor, the final case on the docket is Ordinance 2-23-0245. Bear Valley Partners, plaintiff, Helen, v. McDonald's Corp., Delaware Corp., and Dialed Realty Geneva LLC, defendants, Appalachians. Arguing on behalf of the accountant, Mr. Donald J. Morrison. Arguing on behalf of the Appalachian McDonald's, Mr. Timothy Elliott. Arguing on behalf of the Appalachian Dialed Realty Geneva, Mr. Peter Sloan. All right, so we have the Mr. Morrison at the table, but I guess it's Mr. Donald, Donald Sr., I guess. May it please this Honorable Court, counsel, counsel. I want to get right into this interpretation of Section 4G of the ground lease. Obviously, I want to spend some time talking about the liquidated damage versus penalty, but first I want to talk about just the interpretation and construction of 4G, which I think is vital to everything that happens subsequent in the case. Can I, I want to ask a quick, before you start with 4G, because this relates directly to that, the ground lease was recorded, it's in the recorder's office, correct? Correct. Are you familiar with Cradiville on real estate, Cradiville and Werner? I'm sorry, is it the treatise? No. Cradiville and Werner on real estate? No. Your law school days there. But it is a recommendation to a seller to never sign a contract that will be subject to restrictions of record, even if it's a restriction to build a chicken coop on the land. 4G was available to anybody who was interested because it was recorded, correct? Available to anyone for anyone else to use in terms of being of record and due diligence should have alerted your client. Well, certainly, we looked at the ground lease. Of course, before we purchased the property, we were definitely, I think we were charged with knowing what the ground lease is and what it says. Our position is that the first question is whether or not the terms of 4G are ambiguous or unambiguous. And our first position is that the terms of 4G are unambiguous because Section 21 of the ground lease makes the ground lease subject and subordinate to the courier. And Article 21 of the courier indicates that the courier can be amended at any time. So when you put those two things together, that section of the ground lease and the fact that the courier also, Justice Burkett, are recorded documents, everyone is on notice that the ground lease can be amended at any time. Now, because when we're talking about unambiguous versus ambiguous, we're talking about our position is that the reference to the courier includes any amendments thereto. McDonald's position is that it should be read excluding any amendments thereto. Well, Mr. Morrison, here we have four different owners of these five lots, correct? And that's the reason for these, I assume, these couriers, to identify what's going to happen on that property to the other owners. And I assume also that the other owners can somehow get together when these are amended, these couriers are entered, to make sure that it's consistent with what's going on at Fabian, whatever, Fabian Shoppers. Fabian Crossing. Fabian Crossing. Thank you. So, but there's nothing in that ground lease, pardon me, that says that a new courier amends an existing courier. And I think that's what you're saying should have happened, correct? It did happen. It happened in a first, the first amendment to the courier was signed and recorded a day after the ground lease between Dial and McDonald's was executed. Then there was a second amendment to the courier, which further identified what could and couldn't be done within the subdivision in terms of restaurants. And then we get into the proposed third courier and the actual third courier. But that was, that amended was between Dial and McDonald's. It wasn't between McDonald's and Kimbin or Doty Geneva or Eagle Foods. No, the amendment at the time, back in 1994, was signed by Joe Kine and Van Venture. Those were the only two owners. Okay. Okay. So I have Kimbin, Doty, oh, maybe that's later. That's later. Okay. At the time, and we're talking about the time, okay, we're talking about this historic construction. And when we get to the liquidated damage, we're talking about at the time of contract, okay? Right. And at that time, we already had a document, the courier, which says, which is subject to, the ground lease is subject to and supported to the courier. The courier says it can be amended at any time. So our position is, including, if you, if someone were to say, well, why didn't they, why didn't the drafters say, if they intended to include amendments, why didn't they say including amendments? Because that would have been duplicative. The courier already says that it includes amendments. And I think that that's key. What McDonald's is trying to do is write in the words excluding amendments. And before we even get to whether there's an ambiguity and the getting to evidence of the intent of the parties, I think the first most important thing is that the plain language of the document and of the ground lease and the courier makes it absolutely crystal clear that it includes any amendments thereto. Now, if there's, so there's no reason to really look outside the four corners of the documents under that scenario. If this court were to determine that there is an ambiguity, then I think we need to look at evidence to suggest what the intention of the parties were at the time. The most important evidence of that intention at the time, and this is referenced later in our sample certificate argument against McDonald's and our argument against Dial, but it's section 4J. McDonald's wants you to believe that the reading of 4G is it doesn't include any amendments and there's no restaurants allowed and they're protected. Then why did McDonald's negotiate 4J? 4J contemplated that Dial was going to purchase Lot 2 and then Dial was going to record restrictions on Lot 2. The most important one being pay owners, whether it's Lot 1, 2, 3, 4, 5, at the time it was two owners, any subsequent owners. McDonald's needed Dial to purchase Lot 2 and record a restriction that says you can't amend this courier without McDonald's consent. So the question for McDonald's is if their reading is correct that section 4G excludes any amendments, then they're covered and they don't need to negotiate 4J, which protected them from any further amendments. Another evidence of intent for McDonald's is the letters that they sent. Once the Oberweiss third amendment to the COREA came out in 2018, McDonald's sends a letter that says, hey, if this opens, we're going to invoke 4G and we're going to define the COREA. And the COREA is defined as the original COREA, the first amendment thereto, and the second amendment thereto. Because at the time, those were the only two amendments there. The third amendment, the proposed third amendment for Outback, which we'll get to, was never entered. And this third one was either just being done or being done, and McDonald's doesn't want to recognize that. But they sent another letter then in October of 2020 when Oberweiss opened. And again, McDonald's own words, the REA includes the REA plus amendments. McDonald's doesn't get to pick and choose when it suits them what definition to give to the REA. The REA is plainly defined. And even if you look at this other evidence, both McDonald's actions in negotiating and signing 4G, which protected them, the only reason that they would need that is if they knew that the term REA can be amended at any time. Well, the point still remains, and this is what Justice Burkett has suggested, that once, if Bear Valley was relying on Dial's involvement in the Outback issue, why didn't they wait to close until after Outback was either up or ultimately down? Did they even look? Did they look to see if it had been recorded at that point? Bear Valley, it was obviously public record that Dial had not yet purchased Lot 2, and there's nothing recorded. And for whatever reason, they relied. On the understanding that he would, but I'm assuming this is a rather large investment for them. So why would they go ahead when they knew it wasn't done, even putting in the provision that they did, recognizing that it wasn't done? And I think that your argument is that your point is well taken, and it goes to not really the construction of 4G, but rather whether or not we can hold Dial responsible for not purchasing Lot 2 and recording it. I understand what you're saying. Anyway, you should have known that. That's wrapped up here. But 4G, whether or not Outback happened or not, that's not why we're here in terms of the interpretation of 4G. Because if the interpretation of 4G is as I suggested it, then we don't even get there, because McDonald's doesn't get to abate their rent, and we never have to look to Dial for indemnification. So I think the other question that you have to ask, and I'll move on to the liquidated damages, is why would Bear Val, if Section 4G says that the Kalea can't be amended, right? If it doesn't include any amendments there too, Bear Val knows that as the owner of the outlot, they don't have a seat at the table. They can't vote. They can't control whether or not someone's going to let a Burger King or a Wendy's or an Oberweiss go in there. Why would a sophisticated buyer like Bear Val put themselves at risk of losing millions of dollars when they have no control over the breach? McDonald's says you breached the agreement. What did Bear Val do? Bear Val didn't do anything. We tried to stop it. McDonald's didn't want to take part in our efforts to stop it, but we did everything we could do to stop it. So when we're looking at the intentions of the parties, I think you have to ask yourself, why would Bear Val do that? On the flip side of McDonald's, going back to my 4G argument, they realized that the RAIA could be amended at any time, and they tried to get assurances that Dial would put yourself to have a seat at the table and record restrictions to prevent that from happening. Getting into the liquidated damages versus the penalty, we talk about the three Grosinger factors, Jameson factors, also known as Jameson factors. I want to concentrate first on the second factor, and that is that the amount of liquidated damages are reasonable at the time of contracting. They're in some relation to the damages that might be sustained. The first relevant argument on that is that McDonald's, what did they do with this lease? They treated this lease like thousands of other leases they have across the country. It's a one-size-fits-all approach. If anyone breaches the covenant not to compete, we get a 50% reduction in rent. I first want to concentrate on the rent only. And I would concede that in an income-inducing property like this, tying rent to the amount of money that somebody can make is reasonable. It's reasonable, okay? And that's what the Red Sage case is at. But that is rent only, okay? So now I'm talking about rent. The problem I have with the rent is this arbitrary 50% across the board. Mary Meyer, she testified that it's a standard provision. Has it been subject to litigation? Has it been subject to litigation? McDonald's. Has it been? I interviewed her this morning, or last night and this morning, and there has been. It's pretty clear it's been accepted and has been used by McDonald's. Yes, sir. And without any litigation over it that I could find specifically about the reduction of rent if there's a competing business on adjoining land. Right. I can accept, because it's in the record that we have testimony that it's generally accepted. I would argue that that's not one of the grossing incentives. That's not enough, right? It's not enough. Okay. In fact, it's the opposite. Because when you take a one-size-fits-all approach like that, the case law says that when you evaluate a liquidated damages clause, it must be evaluated in terms of its own circumstances. And they didn't do that. So 50%… Is that 50%? Yes, but go ahead and answer your question. I'll just finish up real quick on the liquidated damages. In addition to that standard one-size-fits-all, whether it's in downtown Chicago or Albany, Illinois, you also have the uncontroverted fact that their sales figures went up, not down. You have this real estate taxes. The dollar value went up, but the number of… Transactions. Transactions went down, right? Correct. But I don't think that's a valid measure. I don't see anywhere that says that's a valid measure. We know the cost of everything went up during that period of time. Everything. You take a position that the transactions… It's like a value meal in McDonald's is probably over $10. A value meal? I spend a lot of money these days. The other issue that I want to briefly touch on is the real estate taxes and the fact that McDonald's gets to abate 50% of real estate taxes and cam charges. Again, I'm conceding the rent is reasonably related. There's no way that the real estate… The amount of real estate taxes that they pay and their percentage of cam is related to whether or not there's a competitor in the area or not. There's no way. That is arbitrary and it's not at all related. The option to purchase is another huge problem. The fact that McDonald's not only gets to abate rent in the $700,000 or $800,000… If we carry this through to 2035, McDonald's is going to save about $700,000 in rent and more in cam charges and real estate. But most importantly, they have an option to purchase this starting in July. From July of 2024 to 2025, they can purchase it. It doesn't take a genius. It's common sense and math that on an income-producing property, when your income is reduced by 50%, your market value is going to be reduced by 50%. That's a windfall. That's a windfall. But once again, when your client bought this property, this lot, was it lot 4, with McDonald's sitting there, these things were all known, correct? Correct. And they assumed the risk. I hate to use that term, but they apparently did, thinking, well, it's going to be okay. I don't know what they thought, but they assumed the risk. I can't really talk about their business judgment, but when you look at the case law on liquidated damages versus penalty, I don't really think that that's a factor. The parties, I mean, if you look at the language in the liquidated damages provision, it's basically baked in the grossing factors, that they agreed in advance to the damages, that the amount brought a relationship to the damages that might be sustained, and that actual damages would be difficult to prove. That's baked into the contract. They agreed to that. I don't, if you look at the language. Right. Well, I still think the case law is the case law. Okay. And I agree that they're on equal footing. We're not talking about a mod pot versus McDonald's. Bear Valley can hold their own versus McDonald's. I'm not saying that. I'm not challenging the first factor. It's the second factor. And one of the main focuses is that we have no control over it. It's McDonald's that gets this windfall. It's not shocking that McDonald's, after Oberweiss announces they're coming in in 2018, what does McDonald's do in 2020? Extend their lease. They extended their lease. Why? Because they knew they were about to get a windfall. They were going to try to invoke 4G and get a windfall. We have no control over that. We have no control over whether they can buy it at a reduced price or keep this clock going until 2035. The bottom line is this is a huge windfall to McDonald's and a huge penalty to Bear Valley. Let me – I want to – neglected to ask this. You filed several lawsuits related to this case. One of them is case number 19-MR-1259 in Kane County. What's the status of that case? And is there a danger of inconsistent judgments given that in this appeal one of your arguments is that the ground lease was not violated because Oberweiss is expressly allowed by the third Korea amendment? If that's the interior – I call it – I'm assuming that's not the zoning – the zoning case. That's the lot – that's the case that Bear Valley has against interior lot owners, meaning Geneva Center and Wakanda. I would submit, Justice Burkett, that if this court were to rule that 4G is – does not allow McDonald's to abate their rent, it takes care of that. It takes care of that lawsuit. If this court were to determine that we're still on the hook, then obviously you can tell from our arguments against that we're going to look for other people to indemnify us or to take that loan off us because, as I said before and I'll keep saying, Bear Valley did nothing wrong here. Bear Valley did absolutely nothing wrong. So is it – that case is still pending now? That case is still pending. We filed an amended complaint recently based upon all the changes of that. I mean, when we originally filed it, Oberweiss hadn't opened yet. And so we tried to amend our complaint to bring it up to speed to everything that's happened over the last two or three years. That case is still pending. And if this – basically, if we lose this appeal, we're going to go forward with that case. If we win on 4G, I'd have to consult with my client, but I would surmise that that case would go away. Is that facility of Oberweiss still open? Yes. Okay. Even – although the bankruptcy has been filed. My understanding is it's still operational. Okay. They don't have one up where I live, so I can't look at a list. All right. Justice Shostak, do you have any questions? I have no questions for Mr. Morrison. Thank you. You'll have an opportunity to reply if you so choose when the other parties are finished. And now the question is, who wants to go first, Dial or McDonald's? We have McDonald's. McDonald's. Okay. Thank you. May it please the Court, Counsel, my name is Tim Elliott, and I represent McDonald's in this case. I'd like to begin by addressing a point that I think you were raising at the end of Mr. Morrison's argument, which is that this is not a situation in which an unsuspecting or unsophisticated party is victimized by some oppressive provision in a lease. Bear Valley is a very sophisticated real estate purchaser. It owns and operates properties across the United States. When Bear Valley bought Lot 4 in 2006, it knew full well about Section 4G of the ground lease. It did its due diligence. It did title searches. It knew that if a competing restaurant opened up, its lease income might go down. They knew about the risk, and they accepted that risk, and even went so far as to try and get indemnification against that risk from Dial. For 14 years, they received full rent. That risk didn't materialize. It did in 2020, and now they are trying to find some way, any way, of avoiding that risk that they willingly accepted back in 2006. As Justice Burkett pointed out, Bear Valley has filed three different lawsuits on this issue. The trial court correctly rejected Bear Valley's arguments. We ask that you affirm that. When Bear Valley, as a sophisticated investor, read the ground lease, was it reasonable for them to believe that subsequent amendments to that lease would automatically impact this first, well, this series of amendments on behalf of McDonald's? Absolutely not. And why not? Because the ground lease says the opposite of that, and I do want to address that point. And the first thing I want to say when I address that point is Mr. Morrison stated that the ground lease is unambiguous. We agree. The trial court agreed. No one's contending this lease is ambiguous. And that's important because a lot of what he argued was McDonald's motivation and McDonald's intent, and this is what they're trying to do. That's all irrelevant. What matters is what the ground lease says. Now, he's trying to conflate the ground lease and the COREA. The ground lease is a simple agreement. It's between the landlord and the tenant on lot four, and it determines their rights and obligations vis-a-vis each other on lot four. The COREA is an agreement amongst all the different property owners at the shopping center. And what he's arguing is every time the COREA is amended, that alters the terms of the ground lease between the landlord and the tenant on lot four. That's his argument. An amendment to the COREA is an amendment to the ground lease. That's not what the ground lease says. Amendments to the ground lease are controlled by Section 17C, which is what the trial court held. Section 17C is a very standard amendment provision that says, this ground lease can only be amended in a writing executed by both parties, or words to that effect. It does not say what he needs it to say, which is, oh, by the way, any time that there's an amendment to the COREA, which, by the way, the owners of lot four have no say in, the terms of this ground lease are going to be amended as well. It doesn't say that. It's very clear that an amendment requires an executed document by both parties. When we say both parties, who are we talking about in this case? The landlord, which was originally Dial, is now Bear Valley, and McDonald's as the tenant. Well, and I may have missed it, is there something in the transaction with McDonald's that prompted Mr. Dial or Dial Real Estate to say, I have to get McDonald's approval for outback. Was that a gentleman's agreement, or was that written somewhere? That was not required anywhere. Dial did the stand-up thing in that circumstance and said, you know what, we don't care, but you better talk to our tenant. And it was the stand-up thing? Right, stand-up thing for Dial to do. By the way, I'll also point out, under the CREA, they didn't even need Dial's agreement to that, because the CREA is very clear in saying the owners of lot four, they don't get a voice. So the owners of lots one and two who are seeking that, they didn't even need to go ask Dial. They did the stand-up thing by asking Dial. Dial did the stand-up thing by asking McDonald's, but that wasn't required. I do want to go back to one other provision of the ground lease, though, because this featured prominently in Mr. Morrison's argument. That's section 21 of the ground lease. That's the section of the ground lease that says the ground lease is subject and subordinate to the terms of the CREA. But every time he quotes that provision, he leaves out the most important part. What paragraph 21 says is the ground lease is subject to the CREA as amended by Exhibit J, which is the First Amendment. The annexation agreement recorded as document, whatever, in the recorder's office of Kane County, and the plan development ordinance 93-43 passed October 18, 1993. In other words, the landlord and the tenant in the ground lease were saying, we agree we're subject to CREA as it exists today with the First Amendment, which was filed and recorded simultaneous with that, as it exists then. Nothing in there says, oh, by the way, any future amendments to the CREA will also amend our obligations. That language isn't in there, and that interpretation is foreclosed both by section 17C, which dictates how amendments to the ground lease occur, and by this language in section 2021, which says we're only subject and subordinate to one iteration of the CREA, and that's the one described here. And if you take a step back, it would be incredibly foolish for McDonald's or Dial to make themselves subject to future amendments to the CREA, because neither of them had any control over those. So for those reasons, their argument, and this is a long-winded answer getting back to your question, Justice Hutchinson, they were not reasonable in interpreting the ground lease that way. And there's no evidence, by the way, that they ever did interpret the ground lease that way back in 2006. If they really believed that interpretation, they wouldn't have needed to pursue the indemnification from Dial. The ground lease states that within 10 days of the acquisition of Lot 2, the landlord shall record certain restrictions against that lot. Doesn't it require a Dial? And isn't the obligation to acquire Lot 2 baked into that provision? I'm not sure I heard your question specifically, but let me answer what I think was your question, which is the evidence showed that at the time of the ground lease, Dial was thinking of acquiring Lot 2. And if they became the owner of Lot 2 and that was recorded, that would essentially give the owners of Lot 4 a voice now in the process. And so that would have bolstered the enforceability of this. It would have made it more difficult to create a new outlaw. Doesn't your interpretation require us to read in the word, if Dial acquires Lot 2? It does interpret that, but I'm not going to pull out the actual language. Our position is that the existing language is pretty clear in saying that, implying the word, if. Within 10 days of the acquisition of Lot 2, landlord shall record a restriction of such lot. I would point out there's no other language that says, that requires them to buy Lot 2, says when they would buy Lot 2, at what price, or anything. I would also point out, this is an argument that kind of cuts both ways for Bear Valley, because Bear Valley has been the landlord for the last 14 years. So if the landlord really does have an obligation to buy Lot 2, then what's Bear Valley been doing since 2006? Because under that theory, McDonald's could sue Bear Valley and say, hey, wait a minute, if you had bought Lot 2 in, say, 2017, you could have blocked this Oberweiss burger joint from going in. So we do not, we agree with the trial court's interpretation of paragraph 4J, is saying it doesn't require the landlord to buy Lot 2, but if the landlord does buy it, then they have to do this. Well, when anticipates a time? Because you said it's when the landlord purchases Lot 2. That's a pretty broad term. Could be today. They might be buying it today. Probably not, but they could be buying it today or tomorrow or the next day. But the fact that they thought about buying it back in, what would that have been? 2006 with... Oh, this was further back. This was 94. Okay, with Outback, I mean? I'm talking about Outback, the Outback one. Oh, sorry, I'm sorry, the Outback was 06. That was 2006, okay. Correct. And I will point out, I think it was in the papers, but if it's not, I want to be clear. McDonald's was not blanketly consenting to a restaurant on Lot 1 at the time of the Outback. But the proposed language made it very clear that McDonald's was okay with a sit-down restaurant where a waiter or waitress... Can I ask you also, on the liquidated damages argument, how is a 50% rent reduction reasonable? If anything, it's extremely conservative. You are, and I think Mr. Morrison were correct in saying that this is pretty standard for McDonald's, but it goes broader than that. The evidence is it's pretty standard in the restaurant industry generally. Red Sage, clearly, was not at McDonald's, and the owner of Dial and the representative from Bear Valley said they're familiar with this for lots of different restaurant change. They had the burden of showing it was unreasonable. And you talked about the three grossing or adjacency factors. This is summary judgment, and they had the burden of coming forth evidence. The law is that these types of liquidated damages provisions are enforceable unless proven to be otherwise. They've got the burden of proof. On the three factors... Mr. Morrison argues that it does amount to a penalty. There's no evidence to support that. On the three factors, they didn't dispute the first factor. They presented zero evidence on the second and third factors. Zero. The arguments today that he made are not supported by any evidence that was in the record. They had to go... So I'll skip the first factor because that's really not in dispute, and you read the provision during his argument. The second factor was whether the amount of liquidated damages was reasonable at the time of contracting. That's 1994. So they had the burden of showing, back in 1994, that the forecast was not reasonable. And not just that it was not reasonable. It had to be so unreasonable as to reap a windfall for McDonald's. That's the case law. Bear Valley digs its own grave on this because they made three admissions in the trial court. Three that foreclosed any recovery. Number one, Bear Valley admitted it had no evidence on this point. That's page 3... Excuse me, 727 of the record. Number two, Bear Valley admitted it did not analyze McDonald's damages. And number three, Bear Valley admitted, and this is a quote, future damages may have been difficult to estimate at the time of contracting. Close quote. That's at page 2765 of the record. Those three admissions individually and collectively demonstrate they don't have evidence on that second factor. And they had the burden. On the third factor, which is whether actual damages would be uncertain in amount and difficult to prove, that third admission I just read forecloses them as well. They had no evidence on that. They did not come forward and present any evidence at all that in 1994, either McDonald's or Dial could have looked into the future 40 years and estimated what the damages would have been. In fact, they even conceded that it would have been difficult. That's the quote I just read you. I do want to address, because I think I'm running short of time. I know I've only got about seven minutes. Yes, it went off, so we're... Oh, I'm sorry. I didn't hear it. Okay. I want to address a couple points that he raised. Okay. Number one, he called this a one-size-fits-all provision. That's a term of art in the liquidated damages jurisprudence. But he's misapplying it. The one-size-fits-all does not mean a provision that's relatively standard in an industry. The one-size-fits-all is a term that was used in the GK development case and has been adopted by other cases, and that's a situation where the liquidated damages is a set amount, and it doesn't matter how severe the breach is or how long the breach lasts, but you have to pay a set amount. In that particular case, GK development, there was a situation where there's a deadline for an improvement to be made at a shopping mall, and the penalty was, I think, several years' worth of CAM or several years' worth of rent. Well, the deadline was missed by a few weeks, and the court said, You don't get to do that. You don't get to charge them for years of costs when they blew the deadline for a short period of time. That's not what this is. Our ability to capture the reduced payments under the lease lasts only as long as the breach, and if the over-licensed broker joint, as a result of their restructuring, goes out of business next month, then the reduced lease payments will stop next month. Second, he talked a lot about the option to purchase, and this is a penalty because of the option to purchase. The problem he's got is they presented zero evidence on that below. If you look through their brief on the option to purchase and how this is going to impact the purchase price, either, A, there's no citation to the record at all for those statements, or, B, they cite to the allegations of their unverified complaint. Well, our review is de novo, and we can make inferences from using our common sense and judgment. Isn't it reasonable to conclude that if rents have dropped 50% that the value of the land is going to be impacted? Isn't that reasonable? I don't think that's reasonable, and in part that's because, first of all, you have to quantify it to determine the extent, but second of all, the process that's called for here is if the parties can't agree, and by the way, this is only a one-year term. It's July of this year to July of next year. If the parties can't agree, they both get to appoint appraisers. The appraisers do competing appraisals, and if they can't agree, then there's a process where I think there's a third appraiser that's appointed. It's a very subjective process, and it's extremely speculative for them to contend that. He also pointed out that reducing the rent might be one thing, but the CAM and the real estate taxes is another thing. That's not the case. I think we quoted or recited the evidence that putting that all together, this would have come out to be about $100 a day in 1994 dollars, and it's about $140 some odd dollars today. That's not an unreasonable amount of decreased revenue, decreased sales with a competing restaurant on the location, and I will point out we keep talking about the Oberweiss. Obviously, McDonald's isn't like any competing quick-serve restaurant, but it's really important to remember that there's a burger store that's attached to that Oberweiss restaurant. It's called that burger joint. It's hard to imagine a more directly competing use than that, and not only that, but on a superior location because that's the outlet that's at the corner of Fabian and Randall. He also pointed out that McDonald's extended the lease because we had a great deal. Not really the case. McDonald's also extended the lease in 2015 with no expectation this would happen. The reality is it's a good location, and they've got an existing restaurant there. There's no evidence they extended it because of this reduction. So unless Your Honors have further questions, I will surrender to Mr. Storm. Justice Shostak? I do have some questions. When this was negotiated, you set out liquidated damages, and you said it was because it would be difficult to look into the future 40 years. I don't understand what you're talking about. Couldn't you, whether it's 40 years ago or today, determine how much they were making versus how much they're making now that these other businesses move in? I think that's two different questions, and at least I'll answer it as two different questions. The factor asks whether damages would be difficult to forecast in 1994. And our point is, in 1994, no one had any idea what the future would hold. I'm pretty confident that the intersection of Randall and Fabian and that area looks a lot different now than it did in 1994. But McDonald's doesn't look any different than it did in 94 or 64 or whenever they first opened, right? I mean, it's pretty easy for McDonald's to track how much money they're making and then how much money they're losing. Not so. So I would say, first of all, McDonald's is in a very different position than it were in 1994. You've got massively different eating trends in this country. You've got health trends that are quite different. You've got different food prices. But to the second point, which is, aren't damages easy to determine now? Bear Valley digs their own grave on this issue as well, and here's why. We pointed out, we said, look, it's not really relevant because the test requires us to go back to 1994. But we will show that we have suffered some diminution in transactions. There's 67 fewer transactions a day at this location since October of 2020. That is quantifiable. But then Bear Valley pipes in and they devote page after page after page of their briefs below and here to saying, whoa, whoa, whoa, whoa. You can't attribute that to us. That could be due to COVID or changing trends or increased prices or, you know, decreased shopping at the anchor stores on the location. There's a million different causes that might be causing that. And you know what? They are right. 2020 is a difficult year to assess anything. The transactions go way down in March of 2020. We all know why. They come back up in the summer. They go down again after October. That's the whole reason that parties like McDonald's and Dial agree to liquidated damages, because they don't want to have the uncertainties of trying to prove lost profits, which are very, very difficult to prove. I see. Thank you. And you said you had several questions. Do you have any more? I do not. Thank you. Thank you, Justice Shastek. Thank you. Thank you. Thank you, counsel. And then, Mr. Christopher, for the Dial realty or Mr. Dial. Dial Geneva. Good morning, your honors. May it please the court, counsel. My name is Peter Storm, and I represent Dial Realty, Dial Geneva. I'd like to pivot quickly to Article 21 of the COREA, which I went back this morning and read again. And I think it's always interesting to go read the COREA document. And that Article 21 of the COREA is the amendment section to the COREA. Excuse me. And it says one standard thing that we all expect in amendment sections, which says you can't amend the COREA except by a writing signed by all parties. That's not unusual. But here comes the really unusual part. And it's really important in terms of the questions you've asked about the record, the recorded documents, and the risk that Bear Valley undertook. The second provision in Article 21 says, and I quote, no amendment or other modifications of this REA shall require any consent or approval on the part of any person other than a party. And I would submit to you the reason for that is because, as you've heard, the outlaw, Lot 4, is not a party to the COREA. Bear Valley does not have a seat at the table. And so that's really important that this amendment provision recognized that the COREA could be amended, and it warned everybody that that could happen without the consent of Lot 4, McDonald's or Bear Valley. And then it does one other thing. The third prong of that provision says amendments are contemplated and foreseeable, and non-parties basically need to be understanding that that could happen and they could be impacted, they could be bound by it. It says the following, and I quote, Notice is hereby given that the parties do foresee and anticipate that amendments and or modifications which will affect occupants and or other persons having an interest or having and acquiring an interest in the shopping center or in a party's parcel, and the parties intend that such occupants or other persons be bound thereby. This COREA also notified, gave record notice to Bear Valley that if they bought this parcel, there could be an amendment to the COREA, and that amendment could bind them, and it could do so without McDonald's or their consent. So now go to the infamous first, third amendment, which my client, Dial, did not record. And this is the core of their indemnity argument because they didn't record that. Paragraph 6 of that amendment makes very clear that unless it's listed in the actual amendment, the COREA stays, the other provisions stay unaffected. And that means that Article 21 and the three things I just read to you were still in place at the time of the drafting of the third amendment, the first one, and it's alleged non-recording. In other words, recording that amendment would not have affected Article 21, and that meant that the COREA the next year or, as it happened, 12 or 14 years later could be amended, and it could be amended in a way that would defeat or overcome any prior amendments, including the proposed third amendment, which was part of the Kimco Outback Steak deal. The flaw in Bear Valley's indemnity argument is that there is no causal connection at all between the non-recording of that amendment and the subsequent amendment that permitted the overrides development and use. And what's really telling, I think, in terms of that is the language that appears in the indemnity letter, which I would submit to you with all due respect to Bear Valley, signifies that they didn't understand the provisions that I just walked through, because they say, and I quote, such recording of this proposed third amendment to the COREA satisfies buyers' concerns that the COREA could be amended by the parties to permit a restaurant or peripheral parcel building that causes the landlord to violate the terms of 4G of the lease. It would do no such thing. They happen to be wrong. That's a totally wrong conclusion about the effect of the recording of that first amendment. It was not going to change the reality that the COREA could be amended to permit the overrides use. The other thing that was going on here is that, as counsel alluded to, is this idea that somehow Dial had an obligation to acquire Lot 2. Dial didn't own Lot 2. Obviously, if he had acquired it, McDonald's wanted to be sure that Dial would record the restrictions, but he had no obligation to do that. And interestingly, and we argued this in our brief, and Mr. Elliott referred to it a moment ago, if that were the case, if the ground lease could actually be read to have required Dial to acquire Lot 2, then what's Bear Valley been doing since 2006? They could have ameliorated the risk that they're complaining about by doing just that. And we think that the trial court was correct in all of its rulings, including its application of the statute of limitations to the claim that somehow Dial breached its obligations, either under the ground lease or with respect to the purchase agreement, which is where the obligation to allegedly record or to record this first third amendment arises. So while their claim for indemnity, I suppose, doesn't arise until McDonald's announces that they're going to reduce the rent, the breach of a purchase agreement, where you're supposed to record something and you don't get it recorded before the closing, certainly has to start running from the time of the closing. And if it was such a material condition of the closing that Bear Valley went to the lengths to extract an indemnity request, one would surely think that at some time between the closing and 2018, way more than 10 years later, somebody would have looked at the record to see whether or not it had been recorded, or sent a letter and said, hey, how come you didn't record this? Of course, the irony, based on what I've just said, is had Dial done that, that still would not have prevented the owners of Lacks 1 and 2 getting together and amending the career again in order to permit the over-wise use. So we don't think that there's any obligation for indemnity. It never arose. That indemnity of obligation is only if the recording of that first third amendment would have cured a violation of the lease. And as I've outlined, there's no way that would have happened. Recording, even if it were to be recorded today, assuming that that was possible, it would not have prevented the owners of the rest of the lots that were subject to the career amending that and doing it without McDonald's consent. So that's basically the gist of our argument. If anybody has any questions, I'd be happy to answer them. Just out of curiosity, what's on the third? Is Eagle still there with its little snack shop? No. There's the at-home store and then Fresh Time and there are other grocery uses. Thank you. Is it possible that the reference to Lot 2 in the ground lease was a scruiner's error and instead should have been Lot 5? No, Lot 5 is the detention pond. Okay. That's close to the road. No, I don't think. At least I'm not aware that that would be a possibility. Thank you. Justice Shostak, anything for Mr. Storm? Nothing. Thank you. Thank you. Now, Mr. Morrison, if you wish, you may proceed. I just want to address briefly the statute of limitations arguments and I think that we argued more of the discovery rule in our briefs and after I reread it in anticipation of the argument today, I think it's more basic than that because the criticism that Bear Valley didn't do certain things is maybe fair in terms of, like, business practices, but in terms of statute of limitations, it wasn't until the Oberweiss Third Amendment is contemplated and recorded and ultimately Oberweiss starts operating that Bear Valley is damaged at all. Had we tried to institute any type of suit or action prior to 2018, all the parties involved would have said, Bear Valley, what are you doing? You have no damages. Nothing's happened to you. Why are you here? This issue isn't ripe yet. It wasn't until that Third Amendment was recorded and that's when we started filing lawsuits and then in 2020, when McDonald's finally put the hammer down and said, we're abating our rent by half percent, that's when we immediately then amended our complaints and had our action for them against damages, for damages. I want to make it clear what we're asking. We're asking under the interpretation under Section 4G, if this court agrees with Bear Valley that either it's unambiguous and the reference to the Correa includes any amendments thereto, then we're asking that this court reverse the trial court's granting of summary judgment to McDonald's and reverse the trial court's denial of our cross-summary motion for summary judgment because there's no issue of fact there. That's an issue of law. There were cross motions for summary judgment that were filed. And so if you agree about our interpretation, whether you find it's unambiguous and you find it's ambiguous, but based upon McDonald's actions in insisting on 4J or McDonald's letters defining the Correa in different terms, either way, that's what we're asking for. Obviously, if there is a reversal on the, I'm sorry, if the court agrees with Bear Valley on the liquidated damage versus penalty, I believe that the appropriate relief would be reversing the trial court's upholding of the liquidated damage clause, and I believe that we'd have to go back to the trial court for a determination of the damages of what is owed back to, I'm sorry. There would be then a McDonald's, if 4G is upheld in McDonald's, then there would be a remand to determine what McDonald's actual damages are. The other thing I wanted to mention. Let me ask while we're in this section, I think. If Dial had an obligation to purchase at that time, does Bear Valley have a continuing obligation to purchase and prevent what's going on on Lot 2? That's an interesting argument. I didn't really see it much in the brief, so I didn't really contemplate it until I heard that argument, and I think that's kind of kicking the can down the road. I think that the intention was certainly that Dial was to purchase. The contemplation was that they were to purchase it. The language says within 10 days of your purchase, you shall record certain things. It's not permissive. It's mandatory, and I think that the burden was on Dial to do that. Well, the recording is mandatory, but is the purchase mandatory? That's where I think the rub is coming here. The whole section is meaningless if Dial isn't required to purchase it. Was it drafted in a way that specifically said Dial shall purchase within a certain date? It doesn't say that, but it also doesn't say if Dial purchases. It contemplates when they purchase it. And so I think that the argument is, well, that's 1994, and then 12 years later, should Bear Valley have purchased it? Maybe, but I didn't see that anywhere really in the briefs. Can you address McDonald's argument regarding the specific language in the ground lease that provides that notwithstanding anything to the contrary here and the terms of the ground lease are specifically made subject to and subordinate to the terms, conditions, covenants, and restrictions contained in the COREA as amended by Exhibit J, et cetera? Absolutely. That it's not every COREA, it's only the first COREA as specifically provided for? Well, under Section 21, it says the COREA and Exhibit J, which is the first amendments to the COREA. And in Section 4G, it just defines the COREA with the date of recording and all that stuff. And then it says REWEA, right? Here's the difference. The reason why 4G doesn't reference the Exhibit J, which is the first amendment to the COREA, is because at the time the ground lease was signed, the first amendment wasn't executed yet. So in Section 4G, the drafters were saying we want to define the COREA as this document that's recorded, along with Section 21, as Mr. Storm said, that can be amended at any time. But the reason it doesn't include Exhibit J, because you're defining the COREA, if you look at, it's in the record under C907 and 909, those were signatures on the first amendment, signed on October 21st of 1994. The ground lease was executed on October 20th of 1994. So the reason why McDonald's wanted Exhibit J to be in Section 21, because Exhibit J made it clear that they can operate a fast food restaurant, they can have a drive-thru, here's my site plan, here's everything we can do, we want to reference that on Section 21 to make sure that that amendment is there, but it could not possibly have been in the definition of REA because it hadn't been executed or recorded yet. Hopefully that answers your question. I have a question, Mr. Morrison. So you're saying that you couldn't have filed it any earlier because it would have been premature. So because it wasn't until Oberweiss moved in that you even knew this. You were aware of it for statute of limitations I'm talking about. So could you have been aware of it or alerted to this any time prior to Oberweiss purchasing? Would you ever, or were you ever able to anticipate, should be the word. Well, I think the arguments that are made against Fair Valley and that are, you know, to Justice Perkins' point when I first stood up is there's a reporter's office for a reason. I get that. I'm not here suggesting that Dial or Fair Valley or McDonald's acted with an overabundance of caution here at all. I'm not saying that good business decisions were made. I'm saying the statute of limitations didn't run. Despite constructive notice. Thank you. Despite constructive notice that certain things didn't happen, but it didn't give rise to any cause of action or damages that would have given rise to a lawsuit. I think we would have been bounced out on likeness. That's all. If there's no other questions, I'll leave. What type of lawsuit would you perceive filing in that instance? Were you, were it not right? Well, so I suppose we could have, that's just the point. I can't really think of much other than you could say I'm going to file a deck action or injunctive action to try to get Dial to recall the Third Amendment. Right? But remember, on the Third Amendment, we're not saying that we're damaged by the recording or not recording of the Third Amendment. It says either record the Third Amendment or identify us. And they never recorded it. So we couldn't ask for identification for anything else because we weren't damaged until 2020. Any other questions? No. I have no further questions. Thank you. I don't either. Thank you. All right. Well, gentlemen, thank you very much for your arguments here today. It's been an interesting business morning here at the court. Not a single criminal case to look to. And we will take this under advisement, and we will issue a decision in due course.